**Richard Jude VILLARS, Appellant,**

v.

**Kathleen Estelle VILLARS, Appellee.**

No. S–14094.

Supreme Court of Alaska.

June 1, 2012.

Andrew J. Fierro, Law Office of Andrew J. Fierro, Inc., Anchorage, for Appellant.

Douglas C. Perkins, Hartig, Rhodes, Hoge & Lekisch, P.C., Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

*OPINION*

STOWERS, Justice.

## I. INTRODUCTION

Richard Villars and Kathleen Villars were married on August 31, 1984. They jointly filed a petition for dissolution of marriage on February 4, 2002. Richard served in the military for most of the marriage, first in the United States Air Force and later in the Alaska Air National Guard. Prior to filing their dissolution, the parties drafted a settlement agreement dividing their property such that each person was to receive half of the marital estate. The value of Richard's military retirement benefits was not known at the time of dissolution because he had not yet qualified for benefits. However, Richard and Kathleen agreed to split the marital portion of Richard's military retirement benefits 50/50 should Richard receive them. Richard began collecting his military retirement benefits in 2009 at the age of 48, twelve years earlier than he and Kathleen had expected at the time of dissolution. Kathleen asserted she was entitled to collect her marital portion of Richard's military retirement benefits when Richard began collecting them. Richard disagreed, arguing that the parties intended Kathleen to collect only when Richard turned 60 years old.

The superior court determined that the settlement agreement was unambiguous and the parties intended to divide equally the marital portion of Richard's military retirement benefits when he began receiving them, not when he turned 60. The superior court ordered Richard to repay Kathleen 50% of the marital portion of the retirement benefits he had received to date. Richard appeals, arguing that the superior court's finding on the parties' intent was erroneous and that the retirement benefits are his separate property until he reaches the age of 60. Richard further argues that the superior court impermissibly modified the settlement agreement. Because the findings of the superior court were not clearly erroneous and the superior court did not make an impermissible modification to the settlement agreement, we affirm.

## II. FACTS & PROCEEDINGS

Richard Villars and Kathleen Villars were married on August 31, 1984. One year prior, on June 1, 1983, Richard began active duty with the United States Air Force at the age of 22. Richard remained on active duty for eight years until July 1991. Richard joined the Alaska Air National Guard in May 1992. At the time of dissolution, Richard was employed by the Alaska Air National Guard and was also a pilot with United Airlines.

Richard and Kathleen jointly filed a petition for dissolution of marriage in the superior court on February 4, 2002. They appended to the petition "Attachment A," a six-page spreadsheet showing how they agreed to divide their assets and debts. The first page of "Attachment A" showed the total value of

their property, which they agreed to split 50/50. The composition of property adding up to fifty percent differed for each of them. Kathleen wanted to keep the entirety of her retirement accounts, which had greater value than Richard's accounts. Richard received cash and personal property to equalize the value of the parties' property division.

To address the division of Richard's United Airlines and military pensions, the parties checked the box on the petition for dissolution stating:

> Our agreement about the distribution of retirement or military pension benefits is attached. If this agreement is not accepted by the retirement plan administrator as a qualified domestic relations order [QDRO], we agree that the court, upon motion by a party, may make any necessary corrections. We agree any such court-ordered modifications will be effective retroactive to the date of the original dissolution decree.

They handwrote underneath, "QDRO's [sic] will be presented at court." Richard's United Airlines and military pensions were included in the asset breakdown in "Attachment A," but their values were unknown because Richard had not yet retired at the time of dissolution. The line item in "Attachment A" pertaining to Richard's military retirement contained the description, "Alaska Air National Guard (monthly benefit at age 60)" and the formula, "1/2 × years of marriage during service/years of service."

On March 13, 2002, Richard and Kathleen appeared in person and testified at a dissolution hearing before Standing Master Suzanne Cole. Master Cole reviewed "Attachment A" with Richard and Kathleen, including the division of the retirement benefits.

> THE COURT: And the way that I understand the division here is the plan is to equalize the retirement benefits 50/50 between the two of you.
>
> MR. VILLARS: Yes.

The parties explained that the QDROs were not ready for presentation to the court, and Master Cole sought clarification on how the parties were dividing the pensions.

> THE COURT: Regarding retirement benefits then, based on your division of other property, there is no intent to claim an interest in the other one's retirement benefits? You're leaving them as they are?
>
> MS. VILLARS: Other than the pensions. We had two QDROs written up. They have not yet been mailed back to us.
>
> . . .
>
> THE COURT: Okay. You still have lost me here. I'm not quite sure what you're doing with the pensions, because at least what's listed here, unless I'm missing something. . . .
>
> MR. VILLARS: The—the present value, we're cashing out 50—50 percent on the retirement.
>
> . . .
>
> MR. VILLARS: And the future value, we are agreeing to, according to the QDRO. . . .
>
> THE COURT: Okay.
>
> MR. VILLARS: . . . so it's a 50 percent share there.

Master Cole, seeking to be clear regarding the parties' description of the pension division in "Attachment A" and their testimony, summarized it again in her own words.

> THE COURT: Regarding the retirement benefits earned by Mr. Villars during the marriage, and that is specifically the employment benefits, the plan is that Ms. Villars is to receive 50 percent of the retirement benefits through QDRO of the employment benefits earned by Mr. Villars; is that right?
>
> MS. VILLARS: For the air national guard.
>
> . . .
>
> THE COURT: It's 50 percent of the benefits earned . . .
>
> MS. VILLARS: Of today.
>
> THE COURT: . . . during the marriage.
>
> MS. VILLARS: Yes.
>
> MR. VILLARS: Yes.
>
> MS. VILLARS: Yes.
>
> THE COURT: Okay. And no other claim is being made on any benefits obtained by Mr. Villars.
>
> MS. VILLARS: Exactly.

Because the QDROs were still being drafted by Colonel Edward Schilling, an attorney retained by Richard, the parties agreed to file the QDROs after the dissolution was finalized. Richard and Kathleen then acknowledged that the divisions in property discussed at the hearing were "final decisions" they would not be able "to modify ... later on" absent a showing of fraud or duress. Master Cole found that the agreement between Richard and Kathleen was "fair and just" and recommended approval of the dissolution agreement. On March 22, 2002, the superior court accepted the master's recommendation, issued a dissolution decree, and the marriage was dissolved.

Colonel Schilling prepared a QDRO for the military benefits soon after. The document, entitled "Order for the Division of the Marital Interest in Military Retired Pay" (hereinafter "2002 QDRO"),[1] expressed Kathleen's fractional interest in Richard's military pension in terms of points rather than years because the Reserve National Guard Retirement System accounts for time spent in the military in terms of points. Section 5 of the 2002 QDRO described the formula to calculate Kathleen's share:

> 5. As her property interest in [Richard's] disposable retired pay,[2] Former Spouse is awarded a portion of said pay calculated as follows:
>
> 50% × (5026 points/points creditable for retirement upon retirement).[3]

Section 9 stated, "The appropriate pay center shall pay the sums called for above directly to Former Spouse to the extent permitted by the law *at the same time the Member receives retired pay.*" (Emphasis added.) Section 11 read, "With the exception of the amounts specifically awarded to Former Spouse, the balance of Member's retired pay is awarded to Member as his sole and separate property." Richard and Kathleen signed and filed the 2002 QDRO and on June 19, 2002, the superior court accepted it.

After the dissolution, Richard worked for six more years as a part-time National Guard member. A part-time guard member typically accumulates credit towards retirement under the reservist system in which a guard member must accrue a minimum of 50 points a year for twenty years to qualify for a pension at age 60.[4] This means that even if the guard member acquires the twenty qualifying years before age 60, the member must wait until age 60 to start collecting the pension. In contrast, under the active retirement system, once a service member accumulates 20 years of service, that service member can retire immediately regardless of whether that member has reached age 60. Once a member in the reservist system accumulates 7,300 points, the member is transferred from the reservist retirement system to the active duty retirement system.[5]

Even though Richard was a part-time reservist, he acquired far more than 50 points a year; in fact he averaged over 300 points per year towards retirement during the sixteen years he was in the National Guard. These high point totals while in the National Guard combined with his eight years of active service from 1983–1991 allowed Richard to transfer from the reservist retirement system to the active duty retirement system.

---

1. A military retirement order, though similar in function, is not technically a qualified domestic relations order, but we refer to it as the "2002 QDRO" in keeping with how the parties and the trial court referred to it. *See* 2 Brett R. Turner, Equitable Distribution of Property § 6:2, at 8 (3d ed. 2005) ("[M]any attorneys and courts use the term QDRO to refer to any qualified order. This usage is a mistake, for other types of qualified orders are needed to obtain disbursement from other types of plans. In particular, a QDRO is not sufficient to authorize payment of military retirement benefits ... [which] requires its own unique type of qualified order.").

2. "Disposable retired pay" is defined in 10 U.S.C. § 1408(a)(4) (2009) as:

the total monthly retired pay to which a member is entitled less amounts which ...
(D) are deducted because of an election under chapter 73 of this title to provide an annuity to a spouse or former spouse to whom payment of a portion of such member's retired pay is being made pursuant to a court order under this section.

3. Richard had acquired 5,026 points towards retirement while married to Kathleen.

4. A point is approximately equal to one day of service.

5. 7,300 points / 365 days = 20 years, or the equivalent of 20 years of active service.

Richard retired from the military at age 48 in July 2009 with 7,919 points towards retirement and began immediately collecting his pension from the active duty retirement system.

When Kathleen learned Richard had retired early, she submitted the 2002 QDRO to the Defense Finance and Accounting Service ("DFAS"), the agency in charge of disseminating military retirement benefits. DFAS rejected the QDRO because it expressed Kathleen's interest in terms of reserve points, but the active duty retirement system had converted Richard's creditable military time from points to years. DFAS instructed Kathleen to obtain a clarifying court order containing a new formula expressed in years within 90 days to obtain benefits.

Kathleen contacted Richard and requested that he direct Colonel Schilling to draft a clarifying order. Colonel Schilling drafted a stipulated clarifying order that converted the points formula in the 2002 QDRO to a formula using years, making no mention of limiting Kathleen's collection to begin when Richard became 60 years old. Richard received this document via e-mail on October 19, 2009, and signed it November 10, 2009. Richard claims he did not agree to modify the age 60 limitation because he believed payments received before age 60 were his separate property. Richard also asserts he was under significant stress due to work and family problems during this time and did not mean for his signature on the stipulated clarifying order to indicate his full approval of the form.

Richard spoke to Kathleen on December 11, 2009, and expressed his desire to have the order include a provision limiting Kathleen's collection of benefits to begin when Richard turned 60 years old. Richard claims he and Kathleen agreed to continue to work with Colonel Schilling to compose the order. However, Kathleen filed a "Notice of Lodging Clarifying Order" with the superior court on December 17, 2009, along with a different clarifying order drafted by her own attorney. The superior court signed Kathleen's clarifying order on December 30, 2009, the last day of the 90–day window DFAS required.

On January 11, 2010, Richard filed an opposition to the notice and requested an evidentiary hearing. Superior Court Judge Sen K. Tan vacated the clarifying order on January 19, 2010 and held two evidentiary hearings on June 24, 2010, and September 8, 2010.

At the first hearing, the superior court was concerned with determining what the trigger was that allowed Richard to retire early. Richard provided testimony to explain his understanding of the two military retirement systems and the property division agreement he made with Kathleen. Richard also testified that had he known at the time of the dissolution that Kathleen would get one-half of his active duty retirement benefits before he turned 60 years old, he would have made property division decisions differently. The superior court indicated it thought the 2002 QDRO was "unambiguous in [Kathleen's] favor."

At the end of the hearing, the superior court made several findings of fact. It found:

What the record reflects in two places, and is very clear, is ... on record before Judge Cole, the parties actually state it pretty clearly, they intended to divide up the marital portion of the retirement 50/50. That was the intent then.

The other thing is, it is also reflected in the 2002 [QDRO] drafted by Colonel Schilling.... I'm going to find that the document reflects the intent of the parties.

In reading that, this whole notion that regardless of whether Mr. Villars could retire early, and if he did Ms. Villars would not get a retirement until age 60 is after-the-fact thinking. Had nothing to do at the time the contract was formed. Not at all. It wasn't even on the horizon. The intent was to divide up 50/50.

The superior court rejected the notion that there was a "specific understanding" between Richard and Kathleen that should Richard retire early, Kathleen would not collect her marital portion at that time and instead would wait until Richard reached age 60 before she would receive her payments. The superior court reinstituted the December 2009 clarifying order.

On July 13, 2010, Richard filed a motion for reconsideration that the court granted for the purpose of hearing from experts on the two military retirement systems.

On September 8, 2010, the superior court held a second evidentiary hearing. Richard's expert, David Carrad, testified that Kathleen should collect payments when Richard turns 60 years old, but conceded this assessment was based upon his understanding of the parties' intent. Kathleen's expert, Marshal Willick, criticized Richard's interpretation based on its impossibility of being enforceable:

> Well, in the ... near 30 years I've been doing [QDROs], I have never seen a military retirement order which had the two parties begin to receive their benefits at different times.... Mr. Carrad said that it is very common to have one party start receiving benefits one time and another party at another [time]. But ... [y]ou can't do that in the military. No way, no how. It's impossible under the statute. You can only divide the payment stream.

The experts agreed that the determination of the parties' intent was a matter for the court to decide.

On October 11, 2010, the superior court issued an order finding "that it was the intent of the parties to divide equally the marital portion of the military retirement." The superior court ordered Richard to repay Kathleen 50% of the marital portion of the retirement benefits that he had received to date.

Richard filed a second motion for reconsideration on October 25, 2010, which was denied. Richard appeals.

## III. DISCUSSION

### A. Standard Of Review

■■■ Contract principles govern the interpretation of property settlement agreements incorporated in dissolution decrees.[6] When interpreting any contract, the goal "is to give effect to the reasonable expectations of the parties."[7] We review the interpretation of a contract de novo.[8] "Where the superior court considers extrinsic evidence in interpreting contract terms, however, we will review the superior court's factual determinations for clear error and inferences drawn from that extrinsic evidence for 'support by substantial evidence.'"[9]

### B. The Superior Court Did Not Err In Finding The Settlement Agreement Unambiguous And The Intent Of The Parties Was To Divide The Marital Portion Of Richard's Retirement Benefits 50/50 Upon Richard's Retirement.

Based on its review of the parties' settlement agreement and the testimony from the first evidentiary hearing, the superior court found that "it was the intent of the parties to divide up Mr. Villars' military retirement 50%/50%." The superior court found "no intent that Ms. Villars would not receive the retirement benefits at the same time as Mr. Villars" or "that she would only receive the benefits when Mr. Villars turned sixty, even if he retired before age 60 and was drawing benefits." Following the second evidentiary hearing, the court confirmed that the parties' intent was to divide the marital portion of Richard's military retirement 50/50 upon Richard's retirement.

### 1. The property settlement agreement is unambiguous.

■■■ We examine "both the language of the [agreement] and extrinsic evidence to determine if the wording of the [agreement] is ambiguous."[10] "An ambiguity exists only where the disputed terms are reasonably

---

6. *Zito v. Zito,* 969 P.2d 1144,1147 n. 4 (Alaska 1998) (citing *Keffer v. Keffer,* 852 P.2d 394, 397 (Alaska 1993)).

7. *Knutson v. Knutson,* 973 P.2d 596, 600 (Alaska 1999) (citing *Keffer,* 852 P.2d at 397).

8. *Burns v. Burns,* 157 P.3d 1037, 1039 (Alaska 2007).

9. *Cook v. Cook,* 249 P.3d 1070, 1077–78 (Alaska 2011) (quoting *Burns,* 157 P.3d at 1039).

10. *N. Pac. Processors, Inc. v. City & Borough of Yakutat, Alaska,* 113 P.3d 575, 579 (Alaska 2005) (quoting *Wessells v. State Dep't of Highways,* 562 P.2d 1042, 1046 (Alaska 1977)).

subject to differing interpretation after viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms."[11]

■ Judge Tan appeared to consider the agreement unambiguous at the first evidentiary hearing when he commented, "[F]rankly, I think [the agreement is] unambiguous in [Kathleen's] favor. The way I've read everything was they were going to split up the retirement when he retired." But the court then proceeded to analyze the intent of the parties and found the parties intended to divide Richard's military retirement 50/50 when Richard retired. We agree with the superior court that the property settlement agreement is not ambiguous, and that it clearly demonstrated the intent of the parties at the time of the dissolution. We also conclude the superior court did not clearly err in its findings regarding the parties' intent.

Richard's argument that the agreement is not ambiguous is focused almost entirely on the line in "Attachment A" which contains the description, "Alaska Air National Guard (monthly benefit at age 60)" and the formula, "1/2 × years of marriage during service/years of service." Richard argues that the term "Alaska Air National Guard (monthly benefit at age 60)," along with evidence from the dissolution hearing leads to the conclusion that the parties understood Kathleen would collect benefits once Richard reached the age of 60. We disagree.

Rather, the property settlement agreement unambiguously shows that the parties intended Kathleen to receive her marital portion of the retirement benefits upon Richard's retirement regardless of age. The settlement agreement consists of the dissolution petition, "Attachment A," and the 2002 QDRO accepted by the superior court. Language from the 2002 QDRO, which both parties signed, clearly demonstrates that the parties intended to divide the marital portion of the military benefits 50/50 beginning when Richard began receiving retirement pay. Section 9 of the 2002 QDRO states, "The appropriate pay center shall pay the sums called for above directly to Former Spouse to the extent permitted by law *at the same time*

*the Member receives retired pay.*" (Emphasis added.) This language directly contravenes Richard's theory of what the parties agreed to in 2002. Further, as the superior court correctly pointed out at the evidentiary hearing, there is no mention of an age 60 restriction on Kathleen's right to receive payments anywhere in the 2002 QDRO.

The parties further explained their intentions regarding the retirement benefits at the dissolution hearing. When Master Cole inquired about "Attachment A," Richard agreed without qualification that the parties' plan was to divide the marital portion of retirement benefits 50/50.

> THE COURT: And the way that I understand the division here is the plan is to equalize the retirement benefits 50/50 between the two of you.
>
> MR. VILLARS: Yes.

The master then sought to clarify the parties' intent:

> THE COURT: Regarding retirement benefits then, based on your division of other property, there is no intent to claim an interest in the other one's retirement benefits? You're leaving them as they are?
>
> MS. VILLARS: Other than the pensions. We have two QDROs written up. They have not yet been mailed back to us.
>
> . . .
>
> THE COURT: Okay. You still have lost me here. I'm not quite sure what you're doing with the pensions, because at least what's listed here, unless I'm missing something. . . .
>
> MR. VILLARS: The—the present value, we're cashing out 50—50 percent on the retirement.
>
> . . .
>
> MR. VILLARS: And the future value, we are agreeing to, according to the QDRO. . . .
>
> THE COURT: Okay.
>
> MR. VILLARS: . . . so it's a 50 percent share there.

Richard testified at the evidentiary hearing before the superior court that he would have negotiated for a share of Kathleen's

11. *Id.* (quoting *Wessells*, 562 P.2d at 1046).

retirement accounts had he known in 2002 that he would get an active duty retirement benefit, arguing that he intended only to share a National Guard retirement benefit with her. However, "[d]ifferences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not considered to be probative."[12]

The superior court considered the parties' testimony before Master Cole in finding that the intent of the parties was to divide the marital portion of the military retirement benefits 50/50. The dissolution hearing testimony, given contemporaneously with the property settlement agreement, is construed to be extrinsic evidence separate from the written documents.[13] So construed, we review the superior court's inferences drawn from extrinsic evidence for "support by substantial evidence."[14] Richard's testimony amply supports the superior court's conclusion that Richard's argument—seeking to limit Kathleen's ability to collect retirement benefits until Richard's age 60—is "after-the-fact thinking" which "[h]ad nothing to do" with the contract when it was formed and "wasn't even on the horizon [then]. The intent was to divide up 50/50."

We agree with the superior court that the language of the property settlement agreement and the parties' testimony shows that the agreement is not ambiguous and that the

parties intended that Kathleen would be entitled to be paid one-half of the marital portion of Richard's military retirement benefits at the time that he began receiving his retirement payments.[15]

## 2. The benefits received between July 2009 and Richard's 60th birthday are not solely Richard's separate property.

■ Richard also argues that the benefits accrued from his retirement in July 2009 to his 60th birthday are his separate property. Richard's argument is similar to the arguments advanced by the appellants in *Hartley v. Hartley*[16] and *Tillmon v. Tillmon*.[17]

In *Hartley*, the former husband argued that the former wife's share of his retirement benefits should be calculated based on the average of his highest three salary years during marriage rather than at the time of retirement when his average salary was higher. We disagreed, concluding that "'a post-divorce merit increase is based upon the employee's entire history of service to the employer. In other words, the post[-]divorce increases are built upon a foundation of prior marital efforts' and therefore the increases are not separate property."[18]

In *Tillmon*, a former husband and wife agreed on a 50/50 split of the marital portion of the former husband's military retirement, but disagreed on how to compute this share.[19] The former wife proposed a QDRO that would split the marital portion of the retirement benefits upon the former husband's future retirement.[20] The former hus-

---

**12.** *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981).

**13.** *See N. Pac. Processors*, 113 P.3d at 584.

**14.** *Cook*, 249 P.3d at 1077–78 (quoting *Burns*, 157 P.3d at 1039).

**15.** Even if the statement in "Attachment A"— "(monthly benefit at age 60)"—rendered the settlement agreement ambiguous, the superior court's findings based on the evidence as a whole—that the parties intended that Kathleen would begin receiving her share of Richard's retirement benefits at the same time he began receiving them—properly resolved the ambiguity.

Richard also argues that the superior court's ruling is not an interpretation of the contract based on the parties' intent but rather an im-

proper modification of the settlement agreement. Because we hold that the superior court did not err in finding that the intent of the parties was to split the marital portion of the retirement benefits 50/50 upon Richard's retirement, it follows that the superior court did not impermissibly modify the parties' settlement agreement.

**16.** 205 P.3d 342, 347 (Alaska 2009).

**17.** 189 P.3d 1022, 1031 (Alaska 2008).

**18.** *Hartley*, 205 P.3d at 349–50 (quoting 2 Brett R. Turner, Equitable Distribution of Property § 6:26, at 171 (3d ed. 2005)).

**19.** 189 P.3d at 1031.

**20.** *Id.* at 1024.

band argued that the former wife's share should be limited to his pay grade at the time of divorce so that she would not benefit from his future pay raises.[21] The superior court agreed with the former wife's calculation and we affirmed.[22]

Here, because Kathleen was married to Richard during seven of his eight years of active service in the military and during his first ten years with the National Guard, Kathleen helped lay the foundation for Richard's future advancement. Richard collected a significant amount of credit towards active duty retirement while married to Kathleen (5,026 points of 7,300 points required). Richard's argument that the military retirement benefits from his July 2009 retirement to his 60th birthday are his separate property is precluded by *Hartley* and *Tillmon.*[23]

## IV. CONCLUSION

We AFFIRM the superior court's October 11, 2010 order in its entirety.

CHRISTEN, Justice, not participating.

---

21. *Id.*

22. *Id.* at 1032.

23. We note, as we did in *Tillmon*, that while Kathleen is entitled to half of the marital portion

of Richard's retirement benefits starting in July 2009, this share is calculated over Richard's entire career with the military, 22.833 years. This equals 30.57%. *See id.* at 1032 n. 35.